UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA STEIDL, | ) | CASE NO. 1:16CV146 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | GEORGE J. LIMBERT |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | MEMORANDUM OPINION & ORDER |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Sandra Steidl ("Plaintiff") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. Plaintiff asserts that: (1) the administrative law judge ("ALJ") failed to properly consider her migraine headaches as a severe impairment at Step Two of the sequential analysis; (2) the ALJ failed to properly consider and analyze the opinion of her treating physician Dr. Zeiger; and (3) substantial evidence does not support the ALJ's Step Four determination. ECF Dkt. #17.

For the following reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE:

**I.     PROCEDURAL HISTORY**

On May 31, 2012, Plaintiff protectively filed applications for DIB and SSI alleging disability beginning November 10, 2010 due to breast cancer, hypertension, glaucoma, migraines, back pain, and hand arthritis. ECF Dkt. #13 ("Tr.") at 179-202.[2]    The Social Security

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the transcript was filed in the CM/ECFsystem rather than the page numbers assigned when the transcript was compiled. This allows the Court to easily reference the Transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECI system.

Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration.  *Id.* at 52-98.  Plaintiff then requested a hearing before an ALJ, which was held on August 19, 2014.  *Id.* at 30-51, 98.

On September 8, 2014, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI.  Tr. at 14-24.  On January 21, 2016, Plaintiff filed the instant suit seeking review of the ALJ's decision.  ECF Dkt. #1.  On April 7, 2016, the parties consented to the jurisdiction of the undersigned.  ECF Dkt. #15.  On June 1, 2016, Plaintiff filed a brief on the merits.  ECF Dkt. #17.  On August 1, 2016, Defendant filed a merits brief.  ECF Dkt. #19.  Plaintiff did not file a reply brief.

## II.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.    MEDICAL EVIDENCE

Plaintiff was diagnosed with breast cancer in 2009 with no lymph node involvement and she underwent bilateral mastectomies with reconstruction on January 29, 2010.  Tr. at 289, 511-521.  She had an arterial bleed during the surgery, but she recovered well.  *Id.* at 310, 618.  She did not have to undergo radiation or chemotherapy and was placed on Arimidex with no complaints of side effects.  *Id.* at 289-291.  She continued to follow up status-post mastectomies and records from March 8, 2010 showed that Plaintiff was doing well overall.  *Id.* at 310-328.  Records from March 7, 2011 indicate that Plaintiff was continuing to do well, but she was anxious as she had not yet found a job after being laid off several months prior.  *Id.* at 328.  Records from October 4, 2011 showed no clinical evidence of recurrent breast cancer.  *Id.* at 292.  Plaintiff also underwent a hysterectomy on November 17, 2010 after a history of uterine fibroids and previous uterine fibroid surgeries.  *Id.* at 589-606.

December 5, 2011 medical records indicate that Plaintiff had generalized aches and pains and she had undergone a trigger finger release and ganglion cyst removal from her right hand on August 31, 2011.  Tr. at 335, 584-588.  It was determined that she was clinically free of evidence of recurrent cancer.  *Id.* at 336.

A December 12, 2011 x-ray of Plaintiff's spine for osteoporosis showed normal results but a worsening since her prior x-ray of October 20, 2009.  Tr. at 298, 302-303, 581.

January and February 2012 treatment notes show that Plaintiff participated in physical therapy for her back.  Tr. at 568-579.

A May 7, 2012 MRI of Plaintiff's lumbar spine showed grade 1 spondylolisthesis at L3-L4 and grade I/II spondylolisthesis at L4-L5 with mild to moderate and severe canal stenosis.  Tr. at 285, 356, 561-562.

June 14, 2012 x-rays of the lumbar spine showed multiple lumbar degenerative changes, spondylolisthesis at L4-L5, and minimal spondylolisthesis at the L3-L4 level.  Tr. at 355, 557-560. Thoracic spine x-rays showed thoracic degenerative disc disease ("DDD").  *Id.*

On June 20, 2012, Plaintiff's treating physician, Dr. Zieger, referred her to Dr. Diulus of the Spine Institute in Medina, Ohio due to her continuing leg and back pain.  Tr. at 349.  Dr. Diulus noted the MRI results showing lumbar stenosis, most severe at the L4-L5 level with spondylolisthesis at the L4-L5 level and to a lesser degree at the L3-L4 level.  *Id.*  Upon examination, the physician's assistant found that Plaintiff had no difficulty arising from a sitting position or acquiring a full, upright position when standing.  *Id.* at 352.  He noted that Plaintiff had moderate pain in the lumbar region at L5, no spasms, and moderate pain in the midline and thoracic region at T8-T12.  *Id.* at 353.  Plaintiff could toe and heel walk and had normal strength and reflexes, but she tested positive for production of numbness in the feet and buttock pain upon straight leg raising.  *Id.* at 354-355.  Dr. Diulus diagnosed lumbago, acquired spondylolisthesis, and spinal stenosis in the lumbar region without neurogenic claudication.  *Id.* at 349.  While believing that Plaintiff would be a good surgical candidate, non-operative treatment was recommended as physical therapy was tried in the past, but not specifically for Plaintiff's spine. *Id.*  Neurontin was also prescribed.  *Id.*

On June 21, 2012, Plaintiff presented to Dr. Moore for follow up of her breast cancer.  Tr. at 505.  It was noted that she was doing well from a breast cancer standpoint, but she was complaining of back pain.  *Id.*  Plaintiff indicated that she had x-rays and a MRI of the lumbar which showed significant degenerative changes and she started the prior night on Gabapentin which was helping.  *Id.*  Physical examination showed no significant edema in the extremities, no masses in the breasts, and a regular heart and lungs.  *Id.*  Dr. Moore noted that Plaintiff's December

12, 2011 bone density study was normal but showed decline from a prior study.  *Id*. She diagnosed Plaintiff with bilateral breast cancer status post mastectomy, tolerating Anastrozole, and clinically free of recurrent disease.  *Id*.  Dr. Moore indicated that Plaintiff would continue taking Anastrozole.  *Id*. at 506.

On June 27, 2012, Plaintiff's ophthalmologist completed a form indicating that Plaintiff had early cataracts and chronic open-angle glaucoma.  Tr. at 343.  Her visual field tests were normal.  *Id*. at 344.

Plaintiff participated in physical therapy in June and July of 2012.  Tr. at 366.  She also underwent epidural steroid injections.  *Id*. at 366-387.

On August 28, 2012, Plaintiff was referred to a pain management clinic for her back pain. Tr. at 388.  She described her pain as aching and sharp and rated it at a 6 out of 10 on a pain scale. *Id*.  She indicated that it was exacerbated by sitting, standing, lifting, arising from sitting and by walking.  *Id*.  She related that physical therapy was ineffective and it hurt.  *Id*.  Upon examination, Plaintiff had bilateral diffuse lumbar spinal tenderness, sacroiliac tenderness, negative straight leg raising, and positive pain reproduction with facet loading.  *Id*. at 391.  She had intact muscular strength, her extremities were normal, and she had no trigger points, a normal gait, and normal muscle tone, sensation and strength.  *Id*.  Dr. Shinn of the pain management clinic diagnosed lumbar spondylosis, DDD of the lumbar spine, spondylolisthesis of the lumbar region, lumbar stenosis, and lumbar radiculopathy.  *Id*.  He recommended continuing injections and to decrease her Neurontin dosage due to side effects.  *Id*.  Plaintiff underwent additional injections in September of 2012 .  *Id*. at 382

On September 18, 2012, Dr. Ghoubrial conducted a consultative examination for the agency.  Tr. at 402.  Plaintiff reported that she could not work because of pain and discomfort in her joints and her back.  *Id*.  She indicated that she had spinal stenosis and had exacerbation of her arthritis due to the Arimidex that she was taking for her breast cancer.  *Id*.  She also reported that the Arimidex and Neurontin that she was taking caused her fatigue  *Id*.  She stated that she could stand for 15 minutes at a time before becoming numb from the waist down.  *Id*.  Upon examination, Dr. Ghoubrial found that Plaintiff was 63.5 inches tall and weighed 211 pounds, she had normal

grasp and manipulation abilities, but moderate decreased range of motion of the lumbar spine on flexion and extension. *Id*. at 405-406. He noted that Plaintiff was able to get on and off the exam table, she could toe and heel walk, and she had normal sensation and a negative straight leg raise test. *Id*. at 406. Dr. Ghoubrial diagnosed arthritis, breast cancer, hypertension, spinal stenosis, and numbness of the legs. *Id*. He opined that Plaintiff would have no difficulty sitting, standing, hearing, speaking, seeing, or traveling, she would not have difficulty lifting or carrying objects intermittently in an 8-hour day, and she would have no difficulty with a sedentary job that required intermittent standing and carrying. *Id*. at 407.

September 26, 2012 medical notes from Plaintiff's surgical doctor indicated that there was no clinical evidence of recurrent breast cancer. Tr. at 409. She noted that Plaintiff was continuing to take Anastrozole without complaint and Plaintiff's main complaint was severe lumbar disc disease. *Id*.

Plaintiff underwent L4-L5 intralaminar epidural steroid injections in September of 2012. Tr. at 531-549. She presented to Dr. Shin, who administered the injections for her low back pain with numbness down her legs, ankles and feet. *Id*. at 548. She rated her pain as 4 out of 10 and indicated that staying in any position for a length of time aggravated the pain, while moving around and laying down helped the pain. *Id*. Dr. Shin's musculoskeletal examination found that Plaintiff had no joint pain or swelling. *Id*. at 550. Her extremities were normal and her sensation was intact. *Id*. He diagnosed Plaintiff with lumbar spondylosis, DDD of the lumbar spine, spondylolisthesis of the lumbar region, severe L4-L5 lumbar stenosis, and lumbar radiculopathy. *Id*. at 552.

On December 21, 2012, Plaintiff presented to Dr. Moore for follow up of her breast cancer. Tr. at 499. It was noted that she was doing well from a breast cancer standpoint, but she was complaining of continued back pain and generalized joint pain. *Id*. Plaintiff indicated that these symptoms existed prior to starting the Anastrozole and she did not want to stop this medication. *Id*. It was noted that Plaintiff had a MRI that showed no evidence of metastases. *Id*. Plaintiff reported that she saw a spine surgeon and was working with a pain management center. *Id*. Physical examination showed no significant edema in the extremities, no masses in the breasts, and

a regular heart and lungs. *Id*. Dr. Moore noted that Plaintiff's December 12, 2011 bone density study was normal but showed decline from a prior study. *Id*. at 500. She diagnosed Plaintiff with bilateral breast cancer status post mastectomy, tolerating Anastrozole and clinically free of recurrent disease. *Id*. Dr. Moore indicated that Plaintiff would continue taking Anastrozole but she advised that Plaintiff could switch medications if she wished. *Id*.

Plaintiff continued to follow up with her primary care physician, Dr. Zeiger, concerning her back pain. Tr. at 427-428. On January 10, 2013, Dr. Zeiger completed a residual functional capacity ("RFC") indicating his diagnosis of lumbar spinal stenosis and his prognosis for Plaintiff as poor for change in status. *Id*. at 432. He identified Plaintiff's symptoms as hand pain, constant low back pain, fatigue, and recurrent lower extremity pain. *Id.* He opined that Plaintiff's symptoms were severe enough to often interfere with her attention and concentration and he noted medication side effects of cognitive impairment and somnolence. *Id.* He further opined that Plaintiff would need to lie down or recline in excess of the normal breaks given in the workplace during an 8-hour day. *Id.* When asked to estimate Plaintiff's functional limitations if she were placed in a competitive work environment on an ongoing basis, Dr. Zeiger opined that Plaintiff could walk less than 1 city block without rest or significant pain, but he was unable to answer how long she could sit or stand/walk at one time, how many pounds she could lift and carry, or her abilities to use her hands, fingers and arms. *Id*. at 432-433. He opined that Plaintiff needed a job that allowed her the ability to shift positions from sitting, standing or walking, and she would need to take hourly unscheduled breaks in an 8-hour day for 5-10 minutes each. *Id*. He also indicated that she did have limitations in repetitive reaching, but he could not answer the degree of those limitations. *Id*. at 433. He also did not answer how often Plaintiff would be absent from work due to her impairments or treatment. *Id*. He  indicated that Plaintiff was not a malingerer, and rather than check "yes" or "no" as to whether Plaintiff was capable of working an 8-hour per day job five days per week, he wrote that Plaintiff could work "sedentary only but uncertain medication impairment of mental/cognitive state with regards to ability to sustain focus." *Id.*

-6-

Dr. Cirino of the Cirino Eye Center indicated that he examined Plaintiff on January 22, 2013 and he diagnosed her with primary open angle glaucoma, dry eye, dermatochalasis, and nuclear sclerosis cataracts. Tr. at 437, 472-478.

On February 13, 2013, Dr. Sunbury, Ph.D., conducted a psychological evaluation of Plaintiff for the agency. Tr. at 443. Plaintiff reported that she worked for 34 years as a nurse's aide and other positions at Medina Hospital, but she was laid off in November of 2010 due to downsizing. *Id*. at 443-444. She indicated that she looked for other work but could not find anything. *Id*. at 444. She indicated that her back pain is so bad that she could not do any physical labor. *Id.* She reported no prior hospitalizations or treatment for psychiatric reasons. *Id.*

When asked about her daily living activities, Plaintiff reported that she wakes up at 5:30 a.m. and visits with her brother-in-law and sister who live next door and she watches their children for an hour. Tr. at 445. She returns home and cleans her house, which takes longer than it did in the past. *Id*. She alternates between sitting, standing and lying down to help her back pain. *Id*. She reported that she goes out to eat or to a flea market with her friends and attends church twice per week. *Id*. at 445-446. Her goal for the year was to keep as active as possible, lose weight, and see a doctor about pain medication that does not cause side effects. *Id*. at 446.

Dr. Sunbury found that Plaintiff made good eye contact, was able to concentrate on his questions, and provided relevant and coherent responses. Tr. at 444. He estimated that she had average intelligence and judgment, low-average insight, and he found that she had no reported symptoms of depression or anxiety. *Id*. at 444-445. He made no diagnoses and rated her global assessment of functioning at 65, indicative of mild symptoms. *Id*. at 446. He opined that she had no psychological limitations in understanding, remembering and carrying out instructions, or in maintaining attention and concentration and in maintaining persistence and pace to perform simple tasks. *Id*. He did state "No limitation except physical ones. She was with the same employer for thirty-four years. She attributes her not being able to find work solely to her arthritis or stenosis and related conditions." *Id*. Dr. Sunbury further opined that Plaintiff related appropriately in the office and recalled good relations with co-workers and supervisors in answer to whether Plaintiff

had limitations in social interactions. *Id*. He also indicated that Plaintiff "[p]robably" had no mental or emotional limitations in responding appropriately to pressures in a work setting. *Id.*

On June 13, 2013, Dr. Hart, a spinal neurosurgeon, evaluated Plaintiff at the request of Dr. Zeiger for her complaints of low back pain. Tr. at 465. Plaintiff explained that she had back pain nearly all of her life, but it had been getting progressively worse over the last few years. *Id*. She described pain and numbness down both of her legs and aching pain at a score of 4 out of 10 in her back. *Id*. She indicated that the pain is present 24 hours per day, although the medications help. *Id.* She reported that the pain level varied with her activities and standing, walking, driving, bending, lifting, getting out of chair, coughing, sneezing, social activities, and housework made her pain worse. *Id.*

Dr. Hart found upon examination that Plaintiff could ambulate without difficulty, she had a normal gait, and she could heel and toe walk without difficulty. Tr. at 466. She had well preserved range of motion in all directions and normal strength in both lower extremities, except fairly significant giveaway weakness in the right lower extremity. *Id*. Normal reflexes and no sensory deficits were found and straight leg testing was negative. *Id.* He recommended a minimally invasive transforaminal lumbar interbody fusion at L4-L5 to correct her spondylolistheses and to stabilize her spine. *Id.* Dr. Hart explained to Plaintiff all of the risks of this procedure and Plaintiff indicated that she wanted to think about whether to have the surgery. *Id*. at 466-467.

On September 19, 2013, Plaintiff presented to Dr. Moore for follow up of her breast cancer. Tr. at 493. It was noted that she was doing well from a breast cancer standpoint, but she was complaining of continued back pain and lower extremity pain. *Id*. She also complained of worsening left hip pain and residual left knee pain. *Id.* She declined a switch of her breast cancer medication to see if her symptoms would stop. *Id.* Plaintiff indicated that she took Tylenol PM at night and no pain medications during the day, although she used a heating pad. *Id*. Physical examination showed no significant edema in the extremities, no masses in the breasts, and a regular heart and lungs. *Id*. at 494. Dr. Moore noted that Plaintiff's December 12, 2011 bone density study was normal but showed decline from a prior study. *Id*. She diagnosed Plaintiff with bilateral

breast cancer status post mastectomy, tolerating Anastrozole, and clinically free of recurrent disease.  *Id*.  Dr. Moore indicated that Plaintiff would continue taking Anastrozole and follow up with her primary care doctor for her left knee pain.  *Id*.

A bone density test performed on February 25, 2014 showed normal results with a minimal decrease in the spine bone density and minimal improvement in Plaintiff's left hip bone density compared to previous bone density tests.  Tr. at 524.

April 15, 2014 notes from Dr. Moore indicated that Plaintiff presented for her breast cancer follow up and complained of significant arthalgias in her feet, hands, shoulders, ankles and hips.  Tr. at 486.  Plaintiff reported that the arthalgias were aggravated by the weather and had worsened over the years.  *Id*.  She was continuing to take the Anastrozole in order to complete her five-year breast cancer course of therapy.  *Id*.  Dr. Moore's physical examination showed no significant edema in the extremities, no masses in the breasts, and a regular heart and lungs.  *Id*.  She noted that Plaintiff's February 25, 2014 bone density study was normal.  *Id*. at 487.  She diagnosed Plaintiff with bilateral breast cancer status post mastectomy, tolerating Anastrozole, and clinically free of recurrent disease.  *Id*.  Dr. Moore indicated that Plaintiff would continue taking Anastrozole through October of 2014 in order to complete her recommended five-year therapy.  *Id*.  She also suggested hip x-rays, but Plaintiff decided to wait.  *Id*.

On May 22, 2014, Dr. Zeiger's medical notes indicate that Plaintiff presented for follow up of her hypertension.  Tr. at 480.  She informed Dr. Zeiger that she had an ALJ hearing scheduled based upon her back condition and she needed a functional capacity evaluation.  *Id*.  She indicated that her gait was off balance and she was dizzy, which correlated to her back pain.  *Id*.  She also indicated that her migraines were worse this time of year as she woke up with headaches and when she sat, her sinuses drained and she felt better.  *Id*.  She also related that her feet and legs from the knees down throb in pain at night and her right ankle was still a problem.  *Id*.  Dr. Zeiger noted that he performed no physical examination beyond reviewing her vital signs and observing her general appearance, which was alert and in no acute distress.  *Id*. at 482.  He diagnosed stenosis of the lumbosacral spine, and ordered physical therapy and a RFC evaluation.  *Id*.

-9-

On July 10, 2014, Plaintiff underwent a nearly four-hour physical work performance evaluation at Medina Hospital by Physical Therapist Linnean. Tr. at 620-651. Plaintiff reported that she had always had back problems and back pain and she was taking Gabapentin which stopped the pain, but she did not like how it made her feel. *Id.* at 621. She was then prescribed another medication, but it bothered her stomach too much. *Id.* After the evaluation, Ms. Linnean opined that Plaintiff's overall level of work fell within the light range. *Id.* She concluded that Plaintiff was capable of sustaining a light work level for 8 hours per day and 40 hours per week with an ability to alternate among other tasks to maximize work tolerance to an 8-hour day because of her limited standing and walking tolerances. *Id.*

### B.    TESTIMONIAL EVIDENCE

At the ALJ hearing, Plaintiff testified that she had a high school diploma and a driver's license. Tr. at 37. She lives in a house with three of her sisters. *Id.* at 38. When asked if she experienced side effects from any of her medications, Plaintiff reported that Dr. Zeiger just started her on Lisinopril and it made her dizzy and light-headed. *Id.* at 39. She indicated that he also cut back on her dosage of Hydrochlorothiazide and her side effects were reduced. *Id.* She also reported that the Arimidex made her tired. *Id.* She indicated that her only pain medication was Ibuprofen at night, and she took cinnamon, turmeric and flaxseed because she tried Gabapentin and another pain medication, but Gabapentin made her too sleepy and the other medication made her nauseated. *Id.* She testified that she spends most of her time during the day sitting with her feet elevated because she has severe pain in her feet and legs and her ankles swell if she does not elevate her feet. *Id.* She was not sure of the cause of the swelling and pain in her ankles and feet, although she thought Dr. Zeiger said it was from bursitis, arthritis, calcium deposits, and side effects from Arimidex. *Id.*

Plaintiff told the ALJ that she does not cook because her sister who enjoys cooking does it and she attempts to clean the house but it takes her several days to clean their small house. Tr. at 40. She also does limited laundry, performing one load per every week or two. *Id.* She also drives four or five days per week to the store. *Id.* at 41. The ALJ also asked about an indication in the record that Plaintiff was babysitting for her sister and Plaintiff responded that her sister who

lives next door has a home daycare and she goes over and lay on the couch and plays with the children while the daycare was open, although she was not responsible for the children. *Id.* She also reported that she went to church with her sisters. *Id.* The ALJ asked if Plaintiff still went to flea markets and she said that she did not, but when the ALJ asked the last time she went, Plaintiff first responded that it was months ago and then she indicated that she went two weeks ago, but she merely walked in to a particular stand, bought what she needed, and left. *Id.* at 42.

Plaintiff informed the ALJ that she could not return to her prior job as a secretary because she needed to keep her feet elevated, her left hand swells, and she has a lot of pain in her hands. Tr. at 42.

Upon questioning by her counsel, Plaintiff indicated that she suffered from migraines once or twice a week in the summer, spring, and fall, and one a week or every other week when it was not high allergy seasons. Tr. at 43. She reported that she suffered migraines all summer long this current year because of the weather. *Id.* She reported that damp, cooler weather also makes her back pain worse and the epidurals that she underwent helped, but only for a month or so. *Id.* When asked about the functional capacity evaluation she had, Plaintiff explained that she forced herself to keep doing it and if the therapist would have told her that she could lay down if needed, she would have done so because she lays down or sits in her recliner most of the time at home with her feet elevated. *Id.* at 44. Plaintiff reported that she asked the therapist if she could rest a minute and when the therapist said yes, she would sit and when the therapist was ready to move to the next activity, the therapist would tell her to get up and start and she would do so without asking her if she was able to do it. *Id.*

The ALJ then questioned the VE. Tr. at 45. The ALJ asked the VE to assume a hypothetical person with Plaintiff's age, experience and education that could: lift, carry, push and pull up to 10 pounds occasionally and 5 pounds frequently; sit for up to 6 hours of an 8-hour workday; stand/walk for two hours of an 8-hour workday; wh cannot climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop and crouch; never crawl or kneel; who is capable of frequent far acuity with no limits on near acuity; and who had to avoid exposure to hazards such as unprotected heights or dangerous moving machinery. *Id.* at 47. When

the ALJ asked whether this hypothetical individual could perform Plaintiff's past relevant work as a secretary, the VE responded that she could as Plaintiff performed that job. *Id*. at 48.

The ALJ then asked the VE to assume a hypothetical person with Plaintiff's age, experience and education and all of the restrictions of his first hypothetical person except that the person also had to elevate her legs directly in front of her at waist level for 30 minutes during the first half of a shift during worktime and not on breaks or lunch, and 30 minutes during the second half of a shift during worktime and not on breaks.  Tr. at 48.  When the ALJ asked whether this hypothetical individual could still perform Plaintiff's past relevant work, the VE responded that she could not. *Id*.  Plaintiff's counsel asked the VE whether this hypothetical person could perform Plaintiff's past work or any work with all of the restrictions as the first two hypothetical individuals that also needed five to ten minute unscheduled breaks every hour during the workday. *Id.* at 49.  The VE responded that such an individual could not perform any work. *Id.*

### III.    RELEVANT PORTIONS OF THE ALJ'S DECISION

In his decision, the ALJ first found that Plaintiff did not engage in substantial gainful activity since her alleged onset date.  Tr. at 16.  He then determined that Plaintiff suffered from the following severe impairments: breast cancer currently in remission; DDD; obesity; and glaucoma. *Id*. at 16-17.

The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Listings.  Tr. at 17-18.  The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she: cannot climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; occasionally stoop and crouch; cannot kneel or crawl; can perform activities requiring frequent far acuity, with no limits in near acuity; and she has to avoid workplace hazards such as unprotected heights and dangerous moving machinery. *Id.* at 18.

The ALJ further found that based upon the RFC and the testimony of the VE, Plaintiff could perform her past relevant work as a secretary.  Tr. at 23.  The ALJ concluded that Plaintiff was not under a disability for social security purposes and was not entitled to DIB or SSI. *Id.*

**IV.**     **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to

social security benefits.  These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward

with the evidence in the first four steps and the Commissioner has the burden in the fifth step.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.**     **STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and

makes a determination of disability.  This Court's review of such a determination is limited in

scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security

as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).

Therefore, this Court's scope of review is limited to determining whether substantial evidence

supports the findings of the Commissioner and whether the Commissioner applied the correct legal

standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

-13-

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## VI.    LAW AND ANALYSIS

The Court takes Plaintiff's contentions out of the order in which she presented them.

### A.    STEP TWO ASSERTION

Plaintiff asserts that the ALJ erred in his Step Two analysis because he failed to consider and discuss the severity of her migraines. ECF Dkt. #17 at 12-13. Plaintiff acknowledges that the ALJ addressed her migraines in his RFC analysis, but she argues that he did not indicate whether the migraines were severe, nonsevere, or a non-medically determinable impairment. *Id.* As support for her assertion, Plaintiff cites to her own testimony concerning the frequency of her migraines during summer, spring and fall and high allergy times. *Id.* at 13.

The undersigned recommends that the Court find that the ALJ's failure to explain why he did not include Plaintiff's migraines as a severe impairment at Step Two is not error. At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not

-14-

significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 404.1520(d).

Here, Plaintiff fails to meet her burden of establishing that her migraines were severe. She offers no explanation or evidence as to how her migraines meet the severity threshold for Step Two. She merely points to her testimony that she suffered from migraines. ECF Dkt. #17 at 12-13; Tr. at 43. In addition, even if the failure to identify migraines as a severe impairment at Step Two did constitute error, the ALJ determined other of Plaintiff's impairments to be severe at Step Two which renders this failure harmless error. Moreover, the ALJ acknowledged Plaintiff's migraines in his decision when he determined her RFC, thereby rendering such an error harmless. Tr. at 18, citing Tr. at 43. The ALJ cited to Plaintiff's testimony about the migraines, how they were worse in the spring and fall, and he cited to the fact that she used to take prescription medications for them but was now taking over the counter medications. *Id*. at 18. An ALJ's failure to include an impairment as severe at Step Two is not reversible error where the ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process as the ALJ could still properly consider the non-included impairment in determining a claimant's RFC. *See Maziarz*, 837 F.2d at 244 (Commissioner's failure to find claimant's cervical condition severe not reversible error since the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process). The ALJ did in fact determine other of Plaintiff's impairments to be severe and he continued onward in the sequential evaluation and considered Plaintiff's migraines in determining her RFC.

In addition, substantial evidence supports the ALJ's decision to find no limitations resulting from Plaintiff's migraines in his RFC for her. Again, the ALJ cited to migraines in his decision,

but Plaintiff's testimony and mere diagnoses alone do not establish the severity of those impressions or diagnoses or the impact on the ability to perform work.  *See Higgs*, 880 F.2d at 860; *see also Mullett v. Colvin*, No. 5:15CV144,  2015 WL 7779226, at *9 (N.D. Ohio Dec. 2, 2015), unpublished (diagnosis of CTS alone did not require ALJ to include limitations in RFC relating thereto).  Moreover, Plaintiff fails to identify any specific limitations that the ALJ should have included regarding her migraines and she fails to refer the Court to evidence that the ALJ failed to consider relating to migraines and any corresponding limitations.  *See Mullett,* 2015 WL 7779226, at *9, unpublished (ALJ did not err in failing to include CTS limitations in RFC where claimant failed to bring forth evidence of doctor recommendation limitations relating to CTS and relying upon CTS diagnosis alone); *Kutscher v. Comm'r*, 2014 WL 3895220, at *13 (N.D. Ohio Aug. 8, 2014), unpublished (ALJ did not err in failing to account for RFC limitations relating to diagnoses of bilateral cervical radiculopathy and lumbar radiculopathy, cervical post laminectomy, and CTS as claimant failed to identify anything more than diagnoses, did not identify limitations resulting from diagnoses, and failed to cite to medical evidence showing those conditions caused significant functional limitations).  Accordingly, the Court finds no merit to Plaintiff's assertions that the ALJ committed reversible error when he failed to include migraines in his Step Two severe impairment determination and when he did not include any related limitations in his RFC.

### B.    TREATING PHYSICIAN'S OPINION

Plaintiff also challenges the ALJ's treatment of the January 10, 2013 opinion of her treating physician, Dr. Zeiger.  ECF Dkt #17 at 9-12.

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)).  Further, it "ensures that the ALJ applies

the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir.2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir.2010) (citation omitted).

In addressing Dr. Zeiger's January 10, 2013 completion of a RFC questionnaire, the ALJ noted the doctor's findings as to Plaintiff's limitations and he afforded them little weight. Tr. at 21, citing Tr. at 433-434. The ALJ noted that Dr. Zeiger indicated that Plaintiff had some limitations, such as in reaching, but Dr. Zeiger failed to specify the extent of the limitations. *Id.*. at 21. The ALJ also reasoned that Dr. Zeiger's opinion was inconsistent with Plaintiff's conservative course of treatment, the functional capacity evaluation, and the wide range of daily activities that Plaintiff performed. *Id.* at 21. He also indicated in the same section of his decision that the conservative care, diagnostic testing, objective  findings upon examinations, functional

-17-

capacity evaluation, and daily living activities supported the RFC that he determined for Plaintiff. *Id.* at 23.

The Court finds that while the ALJ could have provided a more thorough explanation, the ALJ adequately applied the treating physician rule and substantial evidence supports his decision to attribute Dr. Zeiger's opinion little weight.  The ALJ correctly noted that while Dr. Zeiger indicated that Plaintiff was limited in lifting/carrying, reaching, sitting, standing and walking, he did not provide any detail as to the extent of these limitations, even though the form requested that he do so.  Tr. at 21.  For instance, the questionnaire asked Dr. Zeiger if Plaintiff had limitations in repetitive reaching and Dr. Zeiger indicated that Plaintiff did have such limitations.  *Id*. at 433.  The form then requested that Dr. Zeiger set forth by right and left hand a percentage of time during an 8-hour that Plaintiff could reach.  *Id.*  Dr. Zeiger wrote in that he could not answer that question.  *Id*.  He provided the same lack of detail in setting forth the number of pounds that Plaintiff could lift and carry, the number of minutes that Plaintiff could sit, and stand/walk, and he failed to check any of the answers as to whether Plaintiff's impairments or treatments would cause her to be absent from work which ranged from never, once or twice per month, three or four times a month, or more than four times a month.  *Id*.

In addition, the ALJ indicated that while Dr. Zeiger wrote that Plaintiff's medications may impact her ability to stay focused, Dr. Zeiger stated that he was uncertain whether this ability was impacted.  Tr. at 21, citing Tr. at 433.  Plaintiff did indicate at the hearing that when she was taking Gabapentin, she could not think or function, but she testified that Dr. Zeiger stopped that medication and put her on another medication that made her nauseated, so she stopped taking that medication as well.  *Id.* at 39.  She did not indicate that her cancer medication caused attention problems and she was not taking any pain medications but for over the counter medications.  *Id.* Dr. Sunbury, the agency examining psychologist, listed no mental health diagnoses or limitations. *Id*. at 446.  Dr. Sunbury opined that Plaintiff had no limitations in maintaining attention and concentration although he noted her statement that her physical limitations may impact such an ability.  *Id*.  State reviewing psychologist Goldsmith also found that Plaintiff had no medically determinable mental impairment.  *Id.* at 72.  In addition, the ALJ cited to Plaintiff's testimony of

her daily activities that negate a finding of inability to sustain attention as she reported that she drove a car four to five days a week, she shopped, attended flea markets, and helped her sister with an in-home daycare.  *Id*. at 21-22, citing Tr. at 41-42.

The ALJ also noted Plaintiff's conservative course of treatment, including physical therapy that she did not continue, injections which she said moderately improved the pain, and care with a pain management center which she did not continue.  Tr. at 19-20, citing 427, 466, 468-469, 531-532, 538-541, 552-553, 566, 577.  He found that this negated Dr. Zeiger's very restrictive opinion.  *Id*. at 21.  The ALJ further referred to diagnostic testing and objective findings upon examination.  *Id.* at 23.  He cited to findings by Dr. Hart of negative straight leg raising, preserved range of motion in all directions, no joint tenderness or sensory deficits, and the ability to ambulate without difficulty.  *Id.* at 20, citing Tr. at 466.  The ALJ also cited to updated bone density testing that showed normal results.  *Id*. at 20, citing Tr. at 524.  He also cited to the diagnostic results showing grade 1 spondylolisthesis at L3-L4 and grade I/II spondylolisthesis at L4-L5 with mild to moderate and severe canal stenosis.  *Id*. at 19, citing Tr. at 286.  He indicated that Plaintiff was referred to Dr. Diulus, an orthopedic surgeon, following these results and she recommended physical therapy that Plaintiff discontinued after three sessions.  *Id*.  He also cited to Dr. Diulus' essentially normal clinical examination findings, and to those of Dr. Shin.  Tr. at 19, citing Tr. at 352-354, 375-376.  The ALJ also noted Plaintiff's testimony at the hearing that the only medication that she took for migraines and pain was over the counter medications, which was inconsistent with her allegations of severe and disabling pain and Dr. Zeiger's restrictive limitations.  Tr. at 20, citing Tr. at 39.  The ALJ cited to some inconsistencies in Plaintiff's testimony as she testified that she did not babysit children, but then later indicated that she does help her sister at her in-home daycare.  *Id*. at 22, citing Tr. at 41.  The ALJ also pointed out that Plaintiff testified that she longer attends flea markets, but then indicated that she just attended one two weeks ago.  *Id*. at 22, citing Tr. at 42-43.  He also noted that Plaintiff indicated in a letter that she rarely drove, but testified before him that she drove four to five times per week.  *Id*. at 22, citing Tr. at 41, 253.

These findings by the ALJ meet the criteria of the treating physician rule and constitute substantial evidence for his decision to attribute little weight to the opinion of Dr. Zeiger.

## C.    FUNCTIONAL CAPACITY EVALUATION AND AGENCY PHYSICIAN OPINIONS

Plaintiff also challenges the ALJ's decision to attribute little weight to the opinions of agency examining physician Dr. Ghoubrial and Dr. Golestany, and to attribute great weight to the opinions of Ms. Linnean and Dr. Klyop. ECF Dkt. #17 at 10.  However, in doing so, Plaintiff merely mentions these opinions and cites to the weight that the ALJ gave to each.  She does not provide any factual or legal analysis to support her assertions that the ALJ committed error in the weight that he attributed to each of these opinions.

Nevertheless, the Court notes that once the ALJ adequately applied the treating physician rule and provided substantial evidence to support his decision to do so, he could thereafter evaluate the other opinions of record and determine the weight to give them.  Plaintiff asserts that the ALJ erred in affording little weight to Dr. Ghoubrial's opinion.  Dr. Ghoubrial opined that Plaintiff was limited to sedentary work.  Tr. at 407, 433.   State agency physician Dr. Klyop and physical therapist Linnean opined that Plaintiff could perform light work.  *Id.* at 74, 620.  In attributing little weight to Dr. Ghoubrial's opinion, the ALJ explained that Dr. Ghoubrial limited Plaintiff to sedentary work, yet found that she had no limitations, which was internally inconsistent.  *Id.* at 21. This Court agrees.  Dr. Ghoubrial did indeed make essentially normal clinical findings upon testing and examination, and yet, without an articulated basis, he limited Plaintiff to sedentary work with intermittent standing and carrying.  *Id.* at 407.  Substantial evidence supports the ALJ's decision to attribute little weight to Dr. Ghoubrial's opinion as to sedentary work.

Regarding Dr. Golestany's reviewing opinion that Plaintiff was limited to medium work, the ALJ indicated that the opinion was entitled to little weight because Plaintiff's allegations, the functional capacity evaluation, and her treatment notes indicate that she had greater limitations than those found by Dr. Golestany.  Tr. at 22, citing Tr. at 52-56.  The ALJ set forth the details of Plaintiff's allegations, the functional capacity evaluation, and the treatment notes in his decision and Plaintiff provides no specific challenge to the ALJ's decision favorable to her to attribute a

-20-

lesser work level than Dr. Golestany.  Substantial evidence supports the ALJ's determination on this issue.

In attributing great weight to Dr. Klyop's agency reviewing opinion finding Plaintiff capable of light work with additional limitations, Plaintiff again provides no specific challenge to this determination.  Substantial evidence also supports the ALJ's decision to attribute great weight to the opinion as the ALJ explained that it was consistent with Ms. Linnean's functional capacity evaluation, Plaintiff's wide range of daily activities that he described in his decision, and Plaintiff's conservative treatment, which included only over the counter medications for pain.  Tr. at 22.

Finally, substantial evidence also supports the ALJ's decision to rely upon the findings of Ms. Linnean's functional capacity evaluation.  Plaintiff provides no specific argument to challenge the ALJ's decision as to this issue.  Further, although a physical therapist is not an "acceptable medical source" under Social Security regulations, *see* 20 C.F.R. §§ 404.1513(d) and 416.913(d), Ms. Linnean is considered an "other source" and evidence from these sources may be used to show the severity of a claimant's impairments and how they affect the RFC.  *See* Social Security Ruling 06-03p.  Information from these sources cannot establish the existence of a medically determinable impairment, but it can provide insight into the impairment's severity and how it affects the ability of the claimant to function.  *Id.*  Further, "an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source."  *Id.*  Here, the ALJ considered this opinion and in fact explained why he attributed great weight to it.  Tr. at 20-21.  He explained that the evaluation findings were consistent with Plaintiff's treatment courses, the objective examination findings, and with her wide range of daily activities, all of which he detailed in his decision.  *Id.* at 19-22.  The ALJ also explained why he did not accept Ms. Linnean's finding that Plaintiff required a sit/stand opinion, reasoning that Plaintiff's abilities to attend flea markets, fairs and help her sister with an in-home daycare negated such a finding.  *Id.* at 21.

## D. STEP FOUR AND INCOMPLETE HYPOTHETICALS

Plaintiff questions the hypothetical individuals presented to the VE by the ALJ and asserts that the ALJ's Step Four determination is lacking in substantial evidence because the ALJ relied upon the VE's testimony which was based upon incomplete hypotheticals.  ECF Dkt. #17 at 13-14.

The Court finds no merit to this assertion since the Court finds that the ALJ did not commit reversible error in his Step Two analysis concerning Plaintiff's migraines, and substantial evidence supports the ALJ's decision not to include limitations resulting from migraines.  Moreover, as explained above, the Court finds that the ALJ adequately applied the treating physician rule and substantial evidence supports his decision to attribute little weight to the opinion of Dr. Zeiger and his decisions as to the weight attributed to the opinions of Drs. Ghoubrial, Golestany, Klyop and Ms. Linnean.  The ALJ is only required to include limitations in his hypothetical individuals that he found credible.  *Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact").  Plaintiff has also failed to even identify the limitations that she believes the ALJ failed to include.

**VII.**　　**CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and DISMISSES Plaintiff's complaint in its entirety WITH PREJUDICE.

DATE: February 7, 2017　　　　　　　_/s/George J. Limbert_
　　　　　　　　　　　　　　　　GEORGE J. LIMBERT
　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE